[Civ. No. 23878. Second Dist., Div. Three. Feb. 23, 1960.]

CALIFORNIA PORTLAND CEMENT COMPANY (a Corporation), Appellant, v. CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD et al., Respondents.

266

Wallace K. Downey for Appellant.

Stanley Mosk, Attorney General, and Irving H. Perluss, Assistant Attorney General, for Respondents.

VALLÉE, J.—Appeal by California Portland Cement Company from a judgment denying its petition for a writ of mandamus to compel the California Unemployment Insurance Appeals Board to set aside its decision affirming a decision of a referee which affirmed a ruling of the Department of Employment charging petitioner's account with unemployment insurance benefits paid to Silas Carter, a former employee.

The facts are not in dispute.

Petitioner operates a large cement mill near Mojave. Silas Carter was employed as a laborer in the mill on March 27, 1956. On April 6, 1956, he voluntarily quit his employment, stating he was leaving for other work. He was reemployed on May 1, 1956. He continued to work until May 25, 1956. On May 28, 1956, he sent word through another employee that he had quit on May 25, stating he was returning to a job with a former employer.

At the time he was employed by petitioner, Carter stated in writing that from July 1947 to August 1953 he worked for Los Angeles Spring and Wire Manufacturing Company as a coiler and machine operator at $2.50 an hour, except for a period between September 1950 and sometime in 1952, and he was laid off in August 1953; from September 1953 to April 1954 he was a student at National Schools in Los Angeles; from October 1954 to February 1955 he worked for Ciro Brothers, Greenfield, California, as a caterpillar operator at $2.00 an hour, and he left to go north; from March to November 1955 he worked for Emerson Mill and Logging Company at Willow Creek, California, as a truck driver and "cat" operator at $2.50 an hour, and he left because of floods; from December 1955 to March 1956 he worked for M. and R. Sheep Ranch in Mojave as a "cat" operator at $300 a month, and he left because the pay was not enough.

Carter did not seek unemployment insurance benefits until April 21, 1957, when he registered with the Department of

Employment. On May 6, 1957, he received benefits for the week ending May 4, 1957. On May 6 a notice of claim filed and computation of benefits was sent by the department to petitioner as an employer in the base period. On May 6 petitioner "furnished timely information to the department upon receipt" of the notice, requested a ruling from the department, alleging Carter had left its employ voluntarily and without cause, and sought relief from charges to its reserve account. The department endeavored to obtain information from Carter as to his reasons for leaving petitioner's employ by sending a letter to him dated May 27, 1957. The letter was not answered. On June 13, 1957, the department denied the relief sought, holding that Carter left his employment with petitioner with good cause and that its reserve account would be subject to benefit charges.[1]

Petitioner appealed to a referee before whom a hearing was had.[2] The foregoing facts were established together with evidence that Carter was receiving $2.01 an hour at the time he left his employment with petitioner on May 25, 1956, having been promoted from the position of laborer to plug driller, and that in addition he was receiving fringe benefits which were equivalent to $ .31 an hour. There was also evi-

---

[1] The ruling states: "The employer alleges the claimant quit without good cause because he left for other employment. A written request that he provide further information has not been replied to by the claimant. Available facts do not establish that the claimant did not have good cause for leaving."

[2] The appeal to the referee was on a printed form furnished by the department, on the reverse side of which appeared the following: "Request for the production and inspection of Department records necessary to enable a party to safeguard his rights under the Unemployment Insurance Code should be made through the local office of the Department of Employment in which the claim is filed and the nature of the information desired and the reason for the request clearly stated. If the desired information cannot be obtained through the local office, an application may be made to the Referee to whom the case has been assigned for hearing for an order for the production or inspection of records of the Department, in accordance with the provisions of Section 5032 of Title 22, California Administrative Code."

The notice of the hearing before the referee, mailed to petitioner two weeks before the hearing, stated: "Persons interested in this matter must be present at the time and place set for hearing with witnesses. if any, and all evidence that has a bearing on this claim, including pay records, books, receipts and other pertinent material. Evidence may be received on any issue relevant to the eligibility of th claimant for benefits, and parties to this appeal should be prepared to present evidence on any issue which may arise. Continuance of scheduled hearings will be granted only in emergency cases. Failure of the appellant to appear at a scheduled hearing may result in dismissal of the appeal."

dence that steady, year-around, year-after-year work was available to Carter at all times during his employment and thereafter; that his work was satisfactory; that there were no layoffs at petitioner's plant; that it was the most modern in the cement industry, with the best of safety, sanitary conditions, and conveniences, with a health and welfare program provided by Blue Cross at petitioner's expense, a pension plan, paid vacations, and seven paid holidays a year; and that shift differential work allowing from 6 to 9 cents an hour greater pay was available if the employee desired it.

Neither the director nor Carter appeared, or offered any evidence, at the hearing before the referee. The referee found that petitioner "made no request to the department to obtain information from the department records as to claimant's employment subsequent to his working for" petitioner; that petitioner had failed to make a prima facie showing that Carter had left his employment with petitioner voluntarily and without good cause, and affirmed the ruling of the department.

Petitioner appealed from the decision of the referee to the appeals board which affirmed the decision of the referee.[3] Mandamus was then sought in the superior court where the controversy was submitted on the record of the administrative tribunal. The findings of the court were in accord with those of the administrative officers. The judgment affirmed the appeals board.

The parties agree that the burden was on petitioner to produce evidence before the referee which established a prima facie case that Carter left his employment with petitioner voluntarily and without good cause. An employer is entitled to have his reserve account credited with benefits paid to a former employee only if the employee quit his job voluntarily and without good cause. The employer assumes the risk of nonpersuasion.

Petitioner claims it produced evidence which established

---

[3]The appeals board stated: "In the present case, the employer has submitted facts concerning the claimant's working conditions on the job he left, his previous work history and that he left to return to a former employer. Upon this state of the record, we cannot say as a matter of law that the claimant's leaving of work with the employer was without good cause. In our opinion, the employer has failed to produce evidence which would establish a prima facie case that the claimant left his employ voluntarily without good cause within the meaning of code section 1030. We conclude, therefore, that the employer is not entitled to relief from charges to its account for any benefits paid to the claimant."

a prima facie case that Carter left his employment voluntarily and without good cause. Respondents assert petitioner failed to carry its burden of proof. They say "good cause" includes "causes personal to the claimant though unconnected with the employer," and that "an employer has not established a prima facie case when he is able to prove only that the leaving was not 'attributable to him' or 'his fault' by virtue of having favorable working conditions and facilities. An essential element of a prima facie case is lacking, i.e., that there was no good personal cause." Thus, they say, petitioner did not establish a prima facie case since it merely established that Carter left his employment for a cause not attributable to it. Petitioner replies that " 'personal reasons' must be *compelling* before they are considered 'good cause,' " and that the "*compelling reasons* test has been consistently applied by the Appeals Board from the beginning of unemployment insurance," citing a number of its decisions.

■ An employer whose reserve account is charged with any payment made to a claimant has a direct pecuniary interest therein and may seek judicial review of the action of the appeals board. (*Chrysler Corp.* v. *California Emp. etc. Com.*, 116 Cal.App.2d 8, 14 [253 P.2d 68].) ■ The appeals board is a statutory agency with state-wide jurisdiction; it does not have constitutional authority to make final determinations of fact. Any person deprived of a property right by the board is entitled to a limited trial de novo in the superior court. (*Thomas* v. *California Emp. Stab. Com.*, 39 Cal.2d 501, 503-504 [247 P.2d 561].) ■ In reviewing a decision of the trial court, the reviewing court, on facts such as these, determines only whether the decision is supported by the record. (*Ashdown* v. *State of Calif. Dept. of Emp.*, 135 Cal.App.2d 291, 299 [287 P.2d 176].)

■ The inquiry is one of law: whether, on the undisputed facts, petitioner made a prima facie showing that Carter left his employment with petitioner voluntarily and without good cause. (4 Cal.Jur.2d 488, § 606; *Haynes* v. *Unemployment Comp. Com.*, 353 Mo. 540 [183 S.W.2d 77, 80].)

■ The purpose of the unemployment insurance law for the compulsory setting aside of funds to be used for a system of unemployment insurance is to alleviate the burden on the unemployed, and ultimately on the state in the form of poor relief assistance, resulting from indigence due to involuntary unemployment through no fault of the employee,

and to reduce unemployment and the suffering caused thereby to a minimum. It is to insure a diligent worker against the vicissitudes of enforced unemployment not voluntarily created by the worker without good cause. (Unemp. Ins. Code, § 100.)[4] █ The statute is remedial and must be construed for the purpose of accomplishing its objects. (*Garcia* v. *Industrial Acc. Com.*, 41 Cal.2d 689, 693 [263 P.2d 8].) █ However, in the liberal construction to be accorded the statute so as to afford all the relief which its language indicates the Legislature intended to grant, the interpretation should not exceed the limits of the statutory intent. (*California Emp. Com.* v. *Kovacevich*, 27 Cal.2d 546, 549 [165 P.2d 917].)

Section 976 of the Unemployment Insurance Code requires an employer to contribute to the Unemployment Fund for each calendar year with respect to wages paid for employment. Section 1026 provides that the director shall maintain a separate account for each employer, and shall credit his account with all the contributions paid on his behalf; the unemployment compensation benefits paid to an unemployed individual during any benefit year shall be charged against the account of his employer during his base period. The base period is the year ending in the calendar quarter that precedes the beginning of the benefit year by four to six full months, depending on the month in which the benefit year begins. (§ 1275.) The benefit year begins with the week for which a person first files a valid claim. (§ 1276.) Petitioner was a base-period employer, i.e., one who paid the claimant wages during his benefit year. (§ 1275.) The charge of unemployment compensation benefits to an employer's account required by section 1026 is made in such manner as to include as to each computation date all unemployment compensation benefit payments made on or before the computation date. (§ 1028.)

If the department rules ''that the claimant left the employer's [base-period employer's] employ voluntarily and without good cause . . . benefits paid to the claimant subsequent to the termination of employment due to such voluntary leaving . . . which are based upon wages earned from such employer prior to the date of such termination of em-

---

[4] All section references are to the Unemployment Insurance Code unless otherwise indicated.

ployment, shall not be charged to the account of such employer, unless he failed to furnish the information specified in Section 1030 within the time limit prescribed in that section.'' (§ 1032.) As stated earlier, petitioner furnished the information specified in section 1030 within the time limit prescribed in that section.[5]

After a determination of eligibility for benefits, an appeal to a referee may be taken. (§§ 1330, 1331.) The referee, after affording a reasonable opportunity for fair hearing, affirms, reverses, or modifies the determination of the department. (§ 1334.) Any party to a decision by a referee may appeal to the appeals board from the decision. The appeals board may affirm, modify, or set aside any decision of a referee. (§ 1336.)

 There is no question but that Carter left his employment with petitioner voluntarily; he was not laid off or discharged; he left on his own; he willed and intended at the time to leave his job. Did he leave it "without good cause"? What did the Legislature mean by "without good cause"?

There is much conflict in the cases with respect to what is meant by "without good cause" in the unemployment insurance statutes. The conflict seems to be accounted for by the differences in the statutes and regulations promulgated thereunder. When unemployment insurance legislation was first enacted in many of the states, the statute pertaining to disqualification for benefits provided only for the discontinuing of "work voluntarily without good cause." Later there was a movement in some states to tighten the statute to prevent unwarranted depletion of the reserve fund. Many states then amended the statute by adding just following the words "voluntarily without good cause" the words "attributable to the employer." (*Moulton* v. *Iowa Emp. Sec.*

---

[5] Section 1030 at the time in question provided: "Any employer who is entitled under Article 3 of Chapter 5 of this part to receive notice of the filing of a new or additional claim or notice of computation may, within 10 days after mailing of whichever is the earlier of such notices, submit to the department any facts within its possession disclosing whether the claimant left such employer's employ voluntarily and without good cause or was discharged from such employment for misconduct connected with his work. The department shall consider such facts together with any information in its possession and promptly issue to the employer its ruling as to the cause of the termination of the claimant's employment. Appeals may be taken from said rulings in the same manner as appeals from determinations on benefit claims." (Stat. 1955, ch. 1165, § 12.)

*Com.*, 239 Iowa 1161 [34 N.W.2d 211, 214] ; 55 Yale L. J. 147, 150, footnote 5.) California has not done so.

The fact that California has not done so is not an oversight. In 1959 section 1030 was amended without any restrictive language being added to the phrase "voluntarily and without good cause."[6] Section 1264 provides that "an employee who leaves his or her employment to be married or to accompany his or her spouse or to join her or him at a place from which it is impractical to commute to such employment or whose marital or domestic duties cause him or her to resign from his or her employment shall not be eligible for unemployment insurance benefits for the duration of the ensuing period of unemployment and until he or she has secured bona fide employment subsequent to the date of such voluntary leaving." It would seem that such provision was unnecessary unless the Legislature intended that "good cause" include some causes which are personal. It seems clear that it did not mean that the "good cause" must be one arising out of or attributable to his employment or connected with the employment. If the Legislature had intended a similar restriction, it would have said so.

 "Good cause" must be so interpreted that the fundamental purpose of the legislation shall not be destroyed (*Barclay White Co.* v. *Unemployment Comp. Board of Review*, 356 Pa. 43 [50 A.2d 336, 340].)

The Pennsylvania statute reads like ours. *Sun Shipbuilding & Dry D. Co.* v. *Unemployment Comp. Board of Review*, 358 Pa. 224 [56 A.2d 254], says (56 A.2d 258) : "By 'good cause' as used in the Act is obviously meant such a cause as justifies an employee's voluntarily leaving the ranks of the employed and joining the ranks of the unemployed."

*Bliley Electric Co.* v. *Unemployment Comp. Board of Review,* 158 Pa.Super. 548 [45 A.2d 898], states (45 A.2d 903) : "Of course, 'good cause' and 'personal reasons' are flexible phrases, capable of contraction and expansion, and by construction, all meaning can be compressed out of them or they may be expanded to cover almost any meaning. Reducing them to a fixed, definite and rigid standard, if desirable, is necessarily difficult, if not impossible. However, in whatever context they appear, they connote, as minimum requirements, real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce cor-

---

[6]Stat. 1959, ch. 1402, p. 3680.

relative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith. When related to the context of the statute, 'good cause' takes on the hue of its surroundings, and it, and 'personal reasons,' must be construed in the light reflected by its text and objectives. The purpose of the act, declared by § 3, 43 P.S. § 752, is to relieve economic insecurity due to 'involuntary unemployment.' Yet selection of *involuntarily* unemployed workers is accomplished by means of several eligibility and disqualification provisions, and the provision under review provides benefits for employes who *voluntarily* leave employment with good cause. Thus the legislature enacted, paradoxical as it may seem, that an employe who voluntarily leaves his work with good cause is involuntarily unemployed.''

Respondents refer to a statement of a Pennsylvania court made in *Department of Labor* v. *Unemployment Com. Board of Review, (In re Teicher Unemployment Compensation case)*, 154 Pa.Super. 250 [35 A.2d 739, 741], quoted in the margin.[7] The Supreme Court of Pennsylvania characterized the statement as dictum and criticized it in *Sun Shipbuilding & Dry D. Co.* v. *Unemployment Comp. Board of Review*, 358 Pa. 224 [56 A.2d 254]. In the latter case the court stated (56 A.2d 258):

*''In Re Teicher Unemployment Compensation Case*, 154 Pa. Super. 250 [35 A.2d 739, 741], the claimant left her employment to live with her husband who was in the Armed Forces. All seven judges of the Superior Court held that that claimant by voluntarily leaving her work and moving to Alexandria to be with her husband made herself 'unavailable for work' and was therefore not entitled to compensation. Five members of the Court declared that the claimant in leaving her job in order to be with her husband left her work 'with good cause.' This latter conclusion was not necessary to a decision of the case. We express no agreement with the dictum that such a 'humanly justifiable' cause as 'the impulse which induces a devoted wife to spend with her husband, who is a member of the Armed Forces in time of war, what may prove to be the

---

[7]''We are clear that it did not mean the 'good cause' must be one arising out of or connected with the employment. Additional language expressly so restricting the expression is contained in the statutes of a number of states. It is plain to us that, if our Legislature had intended a similar restriction, it would have said so. Causes which are purely personal are, therefore, permitted.'' (35 A.2d 741.)

last days they shall ever be together on earth' (as the Superior Court expressed it) constitutes a 'good cause' for leaving a job, within the meaning of the Act.''

A holding in *In re Sturdevant Unemployment Compensation Case,* 158 Pa. Super. 548 [45 A.2d 898], on the authority of the dictum in the Teicher case, was also disapproved in the Sun Shipbuilding case. (To the contrary of the dictum in the Teicher case, see *John Morrell & Co.* v. *Unemployment Comp. Com.,* 69 S.D. 618 [13 N.W.2d 498].) Personal reasons do not always constitute good cause. (*Handelsman* v. *Unemployment Comp. Board of Review,* 167 Pa. Super. 541 [76 A.2d 235]; *Mattey* v. *Unemployment Comp. Board of Review,* 164 Pa. Super. 36 [63 A.2d 429]; *Dentici* v. *Industrial Com.,* 264 Wis. 181 [58 N.W.2d 717]; *Nashua Corp.* v. *Brown,* 99 N.H. 205 [108 A.2d 52]; annos.: 158 A.L.R. 396, 400; 13 A.L.R.2d 874; 14 A.L.R.2d 1308.)

A prima facie showing requires proof of facts from which a legal conclusion can be drawn. The determination whether an employee left his employment "without good cause" is, in effect, the drawing of a legal conclusion from a set of facts. "Good cause" cannot be determined in the abstract any more than can any other legal conclusion. It can be determined only in relation to a set of facts. The record fails to show that Carter quit his employment with petitioner for personal reasons which have been deemed to be "without good cause." So far as appears, Carter might have had some very compelling reason for leaving his employment with petitioner. Petitioner did not prove that he did not have some such reason. Consequently, petitioner did not establish a prima facie case.

As the appeals board has stated: "In determining the issue of good cause in cases involving a leaving of work to accept other employment no definite standards or criteria can be established which may be uniformly applied in each and every case. Consideration must be given, among other things, to the relative remuneration, permanency and working conditions of the respective employments as well as the inducements or assurances, if any, made to the claimant by the prospective employer." (*Matter of Reserve Account of Pan American World Airways System,* 1A Ruling Decisions, Cal. Unempl. Appeals Bd. Ruling Decision No. R 1.) None of these factors was shown.

Petitioner argues that it made a prima facie case that

Carter left his employment without good cause by circumstantial evidence; that the fact is necessarily inferable from the evidence it produced. The referee and the appeals board found otherwise. We cannot say, as a matter of law, that the only inference deducible from the evidence is that Carter quit without good cause. The statutory scheme commits the determination of these questions in the first instance to the department and its administrative appeal tribunals. ▮▮▮ The test on appellate review is not whether we would come to the same conclusion if the original determination were ours to make, but rather whether the fact-finder could reasonably conclude that petitioner did not establish a prima facie case. ▮▮▮ Under that test it has not been demonstrated that the determination of the administrative tribunals should be set aside.

▮▮▮ Petitioner asserts the department elected to withhold information "including the claims documents themselves," and that "Where a party with power to produce evidence which must overthrow the case made against him, refuses to produce, it, the presumption is that the evidence, if produced, would operate to his prejudice." There is no basis in the record for the assertion. As we have seen, petitioner had ample notice that at the hearing before the referee the burden would be on it to establish a prima facie case; and that if it desired information in the possession of the department, it should request it. Petitioner did not make a request. Of course, if the request had been made it would have been the duty of the department to have furnished petitioner with all information in its possession bearing on the question whether Carter quit his employment voluntarily and without good cause; otherwise a serious question of due process would be presented. (See §§ 1094, 1095.)

Affirmed.

Shinn, P. J., and Ford, J., concurred.